## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| JULIAN PARRILLA PEREZ,<br>CARLA RIVERA CRUZ, and<br>ADY RASHID RODRIGUEZ PEREZ,<br>Plaintiffs, | : : : : : : | CIVIL ACTION<br><br>NO. 18-0997 |
| v. | : : | |
| POLICE OFFICER VEGA,<br>POLICE OFFICER GINGRASSO,<br>and THE CITY OF READING.[1]<br>Defendants. | : : : : : | |

**Henry S. Perkin, M.J.**                                      **February 28, 2020**

## MEMORANDUM

Presently before the Court are Defendants' Motion for Summary Judgment (ECF No. 34) filed November 15, 2019, Defendants' Statement of Material Undisputed Facts in Support of their Motion for Summary Judgment (ECF No. 33) filed November 15, 2019; Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment (ECF No. 38) filed December 6, 2019, and Plaintiffs' Reply to Defendants' Statement of Material Undisputed Facts (ECF No. 38-1) filed December 6, 2019. For the reasons set forth below, the Motion for Summary Judgment is **DENIED** in part and **GRANTED** in part.

### I.    FACTUAL SUMMARY

In the early hours of March 20, 2016, at 3:21 a.m., the Reading Police Department dispatched Officer David Vega to address a noise complaint at Plaintiffs' home. (ECF No. 38 at 2.) Earlier that night, Plaintiffs Julian Parilla Perez ("Parilla Perez"), Carla Rivera Cruz ("Rivera Cruz"), and Ady Rashid Rodriquez Perez ("Rodriquez Perez"), were celebrating the birthday of a

---

[1] Plaintiffs additionally added "Police Officer John Does 1-8" as Defendants to the action. However, as Plaintiffs have yet to identify any of these John Does and substitute the names of the appropriate parties, we dismiss them as Defendants to this suit.

mutual friend at the shared residence of Mr. Parilla Perez and Ms. Rivera Cruz. Id.[2] Parilla Perez greeted Officer Vega at the front door and identified himself as the head of the household. Id. at 3. By the time Parilla Perez opened the door to greet Officer Vega, the noise had ceased. Id.

As soon as Parilla Perez opened the door, Officer Vega asked for identification. (ECF No. 38 at 3.) Having recently moved to the Reading area from New York City, Parilla Perez first provided his New York City photo identification. Id. Not being familiar with this form of identification, Officer Vega asked Parilla Perez for a second form of identification. Id. Parilla Perez then provided Officer Vega with a photo identification card from the Sheriff's Department of the County of Onondaga in the State of New York.[3] Id. Again, not being familiar with this form of identification, Officer Vega proceeded to ask Parilla Perez for his Social Security number. Id. Parilla Perez provided his Social Security number and a recently issued Pennsylvania photo identification card, however, Officer Vega determined this to be unacceptable as he was unable to verify the Social Security number. Id.[4]

After Parilla Perez provided his name, date of birth, Social Security number, and three forms of identification, Officer Vega believed he needed to run Parilla Perez through the Reporting Management System ("RMS") and National Crime Information Center ("NCIC") in order to issue a noise citation. (Vega Dep. 55:8-13, 69:11-12, 91:3-12.) While Parilla Perez's identification was being run, Rodriguez Perez and Rivera Cruz came to the door to see what was happening. (ECF No. 38 at 4.) All three Plaintiffs stood in the doorway to the house and spoke with Officer Vega, who was standing on the sidewalk. Id. According to Plaintiffs, Officer Vega told Parilla Perez that none of his forms of identification resulted in an accurate search result and accused Parilla Perez of having provided fake identification. Id.

Officer Vega subsequently asked if anyone else had identification. Rivera Cruz volunteered to provide her identification and advised Officer Vega that she was also the head of the household. (ECF No. 38 at 4.) Rodriquez Perez also offered to provide identification, but,

---

[2] Parilla Perez and Rivera Cruz, though not legally married, hold themselves out as married and share a residence. (ECF No. 38 at 4.) Rodriguez Perez is the sister of Parilla Perez. Id.
[3] Prior to living in New York City, Mr. Perez lived in Rochester, New York and Syracuse, New York. (Parilla Perez Dep. 10:10-24, 17:24-25.)
[4] Upon later investigation, the Reading Police Department confirmed that the Social Security number written down by Officer Vega was off by one digit. The actual Social Security number began with a five (5), however Officer Vega wrote the number beginning with a four (4). (Vega Dep. 65: 5-16.) It remains a disputed issue as to whether Officer Vega simply wrote the number down incorrectly or whether Parilla Perez gave an incorrect Social Security number.

while doing so, questioned Officer Vega's need to see identification, citing her criminal justice classes. Id. In response, Officer Vega threatened to call for backup, and when Rodriquez Perez went into the house to retrieve her identification, Officer Vega called for backup. Id. at 5. At that point, Parilla Perez retreated inside the house, purportedly because he was fearful of the manner in which Officer Vega was talking to Plaintiffs. (Parilla Perez Dep. 31:7-20.)

Officer William Pletcher arrived at residence at approximately 4:32 a.m. and witnessed three Hispanic females exchanging words with Officer Vega. (ECF No. 38-8.) Per Officer Pletcher's incident report, two of the females stood in the doorway yelling while the third female stood at the bottom step near the sidewalk speaking in a normal conversational tone. Id. Officer Vega indicated that the "female wearing the hat," believed to be Rivera Cruz, said that she lived at the house, but Officer Vega could not verify her identification for a noise citation. Id. As a result, Officer Vega told Officer Pletcher that he planned on taking Rivera Cruz into custody for a LiveScan[5] and asked Officer Pletcher to assist. Id. Officer Pletcher advised Officer Vega that they should wait for additional officers "due to the amount of people in the house." Id. Officer Vega then called for more officers and Officers Carcheri Gingrasso and Brian Adler arrived shortly thereafter at 4:37 a.m. Id.

### A. Arrest of Rivera Cruz

The parties dispute the events that led to the arrest of Rivera Cruz. Though there exists video depicting some of the incident, it is not helpful to resolving all of the factual disagreements surrounding her arrest. Plaintiffs claim that Rivera Cruz went into the residence to retrieve her identification and, by the time she had her identification, police officers were already in the house. (ECF No. 38 at 5.) Seeing tasers drawn, Rivera Cruz put her hands in the air and began yelling in Spanish that she was coming out.[6] Id. Officer Vega grabbed her by the right arm, pulled her out of the house, put her in handcuffs, and put her in the police car. Id.

Defendants maintain that, because Officer Vega could not allow Rivera Cruz to disappear back into the home, he informed her that he would have to take her into custody to verify her identify. (ECF No. 34 at 2) Officer Vega grabbed Rivera Cruz and, trying to pull

---

[5] A "LiveScan" is technology used by law enforcement agencies to capture the fingerprints and palm prints electronically for the purposes of identification. See https://www.certifixlivescan.com/faq_topic/about-live-scan/#q-29952.

[6] Video taken of the incident does not clearly show Rivera Cruz leaving, however, there is audio of a woman stating, in Spanish, "I am going to come out."

away from his grip, she went back inside the home pulling Officer Vega with her. (ECF No. 34 at 2; ECF No. 33 ¶¶ 18-19.) Officer Vega subsequently took Rivera Cruz out of the house, handcuffed her, and placed her in a car without incident. Id. Plaintiffs argue that Officer Vega's claim that he was pulled into the home is contradicted by Officer Pletcher's account wherein he reported going into the house with Officers Vega, Gingrasso, and Adler after Rivera Cruz was pulled into the home by two other women. (ECF No. 38 at 5 n.9.)

### B. **Arrest of Rodriguez Perez**

The parties similarly dispute the events that led to the arrest of Rodriguez Perez. According to Plaintiffs, after speaking with Officer Vega, Rodriguez Perez reentered the residence and began walking upstairs to retrieve her identification. (ECF No. 38 at 6.) While upstairs, Rodriguez Perez heard the officers enter the home and went back downstairs. Id. As she descended the staircase, Rodriguez Perez saw police officers "pointing tasers at everyone," which included a taser pointed at her mother by Officer Gingrasso. Id. Rodriguez Perez began to talk with her mother and Officer Gingrasso tried to handcuff her with one hand while pulling her out of the home with the other hand. Id. When Officer Pletcher observed Officer Vega handcuff Rivera Cruz, he told Officer Gingrasso to disengage with Rodriquez Perez. Id. at 7. However, Officer Gingrasso responded that Rodriguez Perez had hit him, and Officer Pletcher assisted Officer Gingrasso in taking Rodriguez Perez out of the residence. Id. Plaintiffs maintain that Rodriguez Perez was injured as a result of the police grabbing and pulling her from her home to the outside. Id.

Defendants claim that, while Officer Gingrasso attempted to move the other individuals away from Officer Vega and Rivera Cruz, Rodriguez Perez shoved him with both hands. (ECF No. 34 at 2; ECF No. 33 ¶ 27.) Officer Gingrasso informed Rodriguez Perez that she was under arrest and grabbed her right wrist. Id. Rodriguez Perez then struck Officer Gignrasso in the chest with her left hand, and, concerned for the officers' safety, Officer Gingrasso drew his taser, pointed it at the group, and told them to step back. (ECF No. 34 at 2; ECF No. 33 ¶¶ 28-29.) Rodriguez subsequently resisted Officer Gingrasso's attempt to take her into custody, and, with the help of Officer Pletcher, she was eventually led outside of the house and handcuffed. (ECF No. 34 at 2; ECF No. 33 ¶¶ 36-37.) Plaintiffs dispute the claim that Rodriguez Perez shoved or hit Officer Gingrasso. (ECF No. 38-1 ¶¶ 27-28.)

While the video of the incident does not capture the entire interaction between

Rodriguez Perez and Defendants, it confirms several details. As the video begins, Officer Gingrasso is shown grabbing Rodriguez Perez by the right arm with his left hand. While he pulls Rodriguez Perez toward the door of the residence, Officer Gingrasso points his taser toward the group of people repeating the command to "back up." As this occurs, Parilla Perez walks outside the home calmly. A woman, later identified as the mother of Rodriguez Perez and Parilla Perez, pulls on the left arm of Rodriguez Perez while Rodriguez Perez repeatedly tells the officers, in Spanish and English, to not touch her. Officer Gingrasso is asked by the, Alex Martinez, the person filming the incident, why he is taking Rodriguez Perez to which he responds, "she hit me." Officer Pletcher then joins Officer Gingrasso to assist in handcuffing Rodriguez Perez, taking her into custody, and placing her in in a car.

### C. Arrest of Parilla Perez

As seen in the video, while Officer Gingrasso attempts to arrest Rodriguez Perez, Parilla Perez calmly walks outside the residence. As Parilla Perez sits on his neighbors' steps discussing the situation with another officer, Officer Vega approaches him and informs him that he is "going too" for a LiveScan. Officer Vega grabs Parilla Perez, who is now standing, by the left arm, and handcuffs him. As Alex Martinez and the mother of Parilla Perez and Rodriguez Perez continue to talk to the officers, Officer Vega states, "all you had to do was give me your ID." Alex Martinez later states that Parilla Perez did show ID, and another officer responds, "I wasn't here, I don't know."

Parilla Perez was then taken to the police station where he spoke with Officer Vega for approximately fifteen minutes before being released. (ECF No. 38 at 8.) Parilla Perez later received his criminal charges in the mail. Id.

### D. Post-Arrest

Following the incident, Officer Vega charged Rivera Cruz with resisting arrest and violation of the City's noise ordinance, Parilla Perez with obstructing the administration of law and violation of the City's noise ordinance, and Rodriguez Perez with aggravated assault, simple assault, harassment, obstructing the administration of law, and resisting arrest. (ECF No. 33 ¶¶ 49-51.) All three Plaintiffs accepted and completed Accelerated Rehabilitative Disposition, resulting in a dismissal of their charges. (ECF No. 33 ¶ 52.)

## II.  PROCEDURAL HISTORY

Plaintiffs filed the original complaint on March 8, 2018. (ECF No. 1.) This

complaint included three counts. The first count alleged constitutional violations generally and the second and third counts alleged state common law claims for false imprisonment, arrest, assault, and battery. After Defendants filed a motion to dismiss and a request for more specific pleadings (ECF No. 7), Plaintiffs filed an amended complaint. (ECF No. 9.) The amended complaint included ten counts: (1) Fourth Amendment claim for use of excessive force (Count I); (2) Fourth Amendment claim for unlawful seizure (Count II); (3) First Amendment claim for retaliation (Count III); (4) Fifth Amendment claim (Count IV); (5) Eighth Amendment claim (Count V-1 ); (6) Section 1983 claim for conspiracy to violate civil rights (Count V-2); (7) Pennsylvania common law claim for trespass to land (Count VI); (8) Pennsylvania common law claim for false imprisonment (Count VII); (9) Pennsylvania common law claim for assault and battery (Count VIII); and (10) Pennsylvania common law claim for negligent infliction of emotional distress (Count IX). (ECF No. 9.)

Defendants moved to dismiss Counts II, III, IV, V-1, V-2, VII, VIII, and IX on July 13, 2018. (ECF No. 11.) On March 5, 2019 the Honorable Joseph F. Leeson Jr. dismissed Counts II, III, IV, V-1, and VII with prejudice, however granted Plaintiffs leave to file a second Amended Complaint with respect to Count V-2 and the claim for section 1983 selective enforcement. (ECF No. 18.) Plaintiffs filed a Second Amended Complaint on March 25, 2019, including only five counts: (1) Fourth Amendment claim for use of excessive force (Count I), (2) Section 1983 claim for selective enforcement (Count II), (3) Section 1985 claim for conspiracy to violate civil rights (Count III), (4) Pennsylvania common law claim for trespass to land (Count IV), and (5) Pennsylvania common law claim for assault and battery (Count V). (ECF. No. 19.)

On April 25, 2019, all parties consented to jurisdiction before United States Magistrate Judge Henry S. Perkin. (ECF No. 23.) Defendants filed the instant Motion for Summary Judgment on all claims on November 15, 2019. (ECF No. 34.) On December 6, 2019, Plaintiffs filed their Response in Opposition to the Motion for Summary Judgment. (ECF No. 38.)

## III.    LEGAL STANDARD

Summary judgment is appropriate where the record and evidence, taken in the light most favorable to the non-moving party, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The essential inquiry is "whether the evidence presents a sufficient disagreement to require

submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-252 (1986). The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. Anderson, 477 U.S. at 249. A factual dispute is material only if it might affect the outcome of the suit under governing law. Id. at 248.

To defeat summary judgment, the non-moving party cannot rest on the pleadings, but rather, that party must cite "to particular parts of materials in the record" showing that there is a genuine dispute for trial. Fed. R. Civ. P. 56(c). Similarly, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989) (citing Celotex, 477 U.S. at 325). The non-moving party has the burden of producing evidence to establish prima facie each element of its claim. Celotex, 477 U.S. at 322-323. If the court, in viewing all reasonable inferences in favor of the non-moving party, determines that there is no genuine dispute as to any material fact, then summary judgment is proper. Id. at 322; Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 83 (3d Cir. 1987). When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing' - that is, pointing out to the District Court - that there is an absence of evidence to support the non-moving party's case." Jones v. Indiana Area Sch. Dist., 397 F. Supp.2d 628, 642 (W.D. Pa. 2005) (quoting Celotex, 477 U.S. at 325).

## IV.  DISCUSSION

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the Constitution and the laws of the United States and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988). Plaintiffs first assert an excessive force claim against all Defendants, arguing that, while acting under color of state law, Defendants unreasonably seized Plaintiffs by violently and excessively effectuating their arrests. (ECF No. 19 ¶¶ 45-48.)

Defendants move for summary judgment with respect to Rivera Cruz and Parilla Perez's excessive force claims on the grounds that (1) the sole potential claim for excessive force

is based on allegations by Plaintiffs that their handcuffs were too tight and caused pain and (2) Plaintiffs' claims fail to meet the standards established by precedent in the Third Circuit and in this district regarding handcuffing cases. (ECF No. 34 at 7-9.)   In regard to Rodriguez Perez's claim for excessive force, Defendants maintain that the force used by Officer Gingrasso was constitutionally permissible and necessary to overcome her resistance to arrest. Id. at 9.  Even if the Court finds that Defendants used excessive force during the seizure, Defendants argue that Officers Vega and Gingrasso are entitled to qualified immunity. Id. at 12-14.

In response, Plaintiffs maintain that any and all force used by Defendants was excessive because "objectively reasonable officers do not instigate citizens in a calm, controlled situation." (ECF No. 38 at 11.)  Plaintiffs argue that, before Officer Vega made any physical contact with any of the Plaintiffs, he had all of the necessary information to issue a noise citation. Id. at 13. Thus, the Defendants conduct of forcibly entering the home as well as grabbing, pulling, and handcuffing the Plaintiffs was excessive in light of the situation. Id. at 15.

## A. Excessive Force

The Fourth Amendment guarantees the "right of the people to be secure in their persons houses, papers, and effects, against unreasonable searches and seizures." U.S.C.A. Const. Amend. 4. In the context of an "arrest or investigatory stop," excessive force claims invoke the protections of the Fourth Amendment against unreasonable seizures, and are analyzed under a "reasonableness standard."  Graham v. Connor, 490 U.S. 386, 394–95 (1989). Thus, in order to establish a claim under the Fourth Amendment, Plaintiffs must show that the actions of Defendants: (1) constituted a "seizure" within the meaning of the Fourth Amendment, and (2) the seizure was "unreasonable" in light of the surrounding circumstances. Brower v. County of Inyo, 489 U.S. 593, 595-600 (1989).

### i. Seizure of Plaintiffs

Neither party contests that a seizure occurred, however, Plaintiffs claim that there remain genuine issues of material fact as to when Plaintiffs were under arrest. Plaintiffs assert that the custodial arrest did not occur until after Officers Gingrasso and Vega had already unnecessarily exerted force and prevented Plaintiffs from showing identification.  Accordingly, Plaintiffs argue that the officers' objective reasonableness should be evaluated in view of the fact that the officers' exerted force while seizing the Plaintiffs and not while in the process of arresting them.

In a similar case to the one before this Court, the Honorable Lawrence F. Stengel addressed the question of whether and when a seizure occurred prior to a custodial arrest. See Morales v. Taveras, No. CIV.A.05 4032, 2007 WL 172392, at *5-6 (E.D. Pa. Jan. 18, 2007) . The plaintiff in Morales, also a resident of Reading, Pennsylvania, was cited and arrested for violating the city's noise ordinance and alleged she was unlawfully seized at the moment the officer confronted her to issue her a citation. Id. at *1.

In Judge Stengel's analysis, he first explained the standard for when a confrontation between a police officer and citizen becomes a seizure. A seizure triggering the Fourth Amendment's protection occurs when an officer makes "a show of authority that restrains the liberty of a citizen or a 'government termination of freedom of movement intentionally applied.' The caselaw also shows that an actual physical touching is not required to effect a seizure." Id. at *5 (citing Gallo v. City of Phila., 161 F.3d 217, 223 (3d Cir.1998)). "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." Id. (citing  United States v. Mendenhall, 446 U.S. 544, 554 (1980)).  Viewing the evidence in the light most favorable to the plaintiff, Judge Stengel found that the officer did not seize Morales when he initiated the conversation with her or when he informed her that he planned to issue her a citation. Id. at *6. However, when the officer informed Morales that she was required to provide him with her Social Security number, the "dynamics of the situation changed." Id. "When a police officer in uniform informs a person that she must abide by his orders, any reasonable person would believe that she was not free to leave the scene." Id. (citing Florida v. Bostick, 501 U.S. 429, 434-35 (1991)).

This Court similarly finds that there existed two different Fourth Amendment "events" that constituted a seizure.  When Officer Vega accused Parilla Perez of having provided false identification, and threatened to call for backup if Rodriguez Perez and Rivera Cruz did not offer identification, Plaintiffs were "seized" for the purposes of the Fourth Amendment. Though Rodriguez Perez and Rivera Cruz did attempt to reenter the home, they did so presumably to comply with Officer Vega's command to retrieve and provide their identification. The second "event" that constituted a seizure for each Plaintiff occurred at the point when they were arrested. With respect to Rivera Cruz, her non-custodial seizure ended when, after seeing tasers drawn and offering to come out, Officer Vega grabbed her by the right arm, pulled her out of the house, and

put her in handcuffs. Regarding Parilla Perez, when Officer Vega approached him on the steps, informed him that he was going in for a LiveScan, grabbed him by the arm, and handcuffed him, his non-custodial seizure became an arrest. Finally, concerning Rodriguez Perez, at the point Officer Gingrasso grabbed her and attempted to handcuff her while pulling her out of the home, her non-custodial seizure ended.

### ii. Reasonableness of the Seizure

"[T]he reasonableness inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397 (citing Scott v. United States, 436 U.S. 128, 137–39 (1978); Terry v. Ohio, 392 U.S. 1, 21 (1968)). When evaluating the reasonableness of the force used, the court must judge "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. at 396 (citing Terry, 392 U.S. at 20–22).

The "test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," however, "its proper application requires careful attention to the facts and circumstances of each particular case. . ." Id. at 396. How much force is reasonable in effectuating a seizure or arrest is based on the "totality of the circumstances" which may include: 1) the severity of the crime at issue, 2) the immediate threat to the safety of the officers or others that the suspect poses, 3) whether the suspect is resisting or evading arrest, 4) how "violent or dangerous" the suspect is, 5) the "duration" of the force, 6) whether the force was used in making an arrest 7) whether the suspect might be armed, and 8) the number of people with whom the police must contend. Id.; see also Sharrar v. Felsing, 128 F.3d 810, 822 (3d Cir.1997) abrogated on other grounds by Curley v. Klem, 499 F.3d 199, 209–11 (3d Cir. 2007). None of these factors alone are controlling in determining whether a use of force was objectively reasonable. Martin v. City of Reading, 118 F. Supp. 3d 751, 760 (E.D. Pa. 2015).

Defendants correctly note that Plaintiffs may not challenge the validity or lawfulness of the underlying arrest as their decision to accept and complete the ARD program precludes them from doing so. See Gilles v. Davis, 427 F.3d 197, 211-12 (3d Cir. 2005). However, each Plaintiff maintains that there exists a genuine dispute as to whether the amount of force applied during the non-custodial seizure and the eventual arrest was objectively reasonable and this Court agrees.

Focusing specifically on the amount of force applied prior to the arrests, and applying the <u>Graham</u> and <u>Sharrar</u> factors, the Court first examines the severity of the crime. Violation of the noise ordinance is a minor crime subject to a fine of not less than $25.00 and no more than $1,000.00, plus costs. Reading Code § 387-109. Further, as noted by Plaintiffs, at the point Parilla Perez provided his name, address, date of birth, and multiple forms of identification as the head of the household, Officer Vega arguably had enough information to issue a noise citation.

As to the immediate threat to the safety of the officers, none of the Plaintiffs presented a threat when first approached by Officer Vega as Parilla Perez attempted to comply with Officer Vega's requests for identification. While both parties admit that Rodriguez Perez questioned Officer Vega's need for further identification, all three Plaintiffs offered to retrieve their identification at various points throughout the interaction. Officer Vega admits in his deposition that, even at the point Rivera Cruz attempted to reenter the residence, he "never felt threatened." (Vega Dep. 74:1-12). He further indicated that Parilla Perez was "very pleasant" throughout the encounter and "never disrespected" him. <u>Id.</u> 68:11-17. Additionally, none of the Plaintiffs were presumed to be armed or searched for weapons. As the incident progressed, Officer Pletcher does note in his incident report that "due to the amount of people in the house," they requested backup prior to taking Rivera Cruz into custody. (ECF No. 38-8) Officer Gingrasso also stated that, during the arrest of Rivera Cruz, he drew his taser as the officers were "heavily outnumbered." (Gingrasso Dep. 53:15-24, 54:1-3.) Overall, until the officers began to effectuate the arrests, no immediate threat existed to the safety of the officers.

Viewing the evidence in the light most favorable to the Plaintiffs, a reasonable jury could find that neither Rivera Cruz or Parilla Perez attempted to resist or evade arrest. As depicted on the video, once the officers entered the home, Parilla Perez voluntarily walked outside the home and sat on his neighbor's steps while discussing the situation with another officer. Giving credit to Rivera Cruz's account of the facts, once she realized that the officers had entered her residence, Rivera Cruz put her hands up and walked outside before being grabbed and handcuffed. As shown in the video, however, Rodriguez Perez does resist as Officer Gingrasso tries to pull her out of the home and handcuff her.

In determining whether an officer's conduct is objectively reasonable, consideration should be given to "the relationship between the need for the use of force and the

amount of force used." Kingsley v. Hendrickson, 135 S. Ct. 2466, 2473 (2015).  While the amount of force used may have been objectively reasonable at the point in which the officers arrested each Plaintiff, this Court finds that there exists a dispute of genuine issues of material fact as to whether the amount of force used prior to the arrest, during the non-custodial seizure, was reasonable. A jury could conclude that because, (1) violation of the noise ordinance is a minor crime, (2) Defendants had the information necessary to issue a citation, (3) Plaintiffs did not present an immediate threat to the safety of the officers, and (4) Plaintiffs attempted to comply with Defendants orders to produce multiple forms of identification, the force used by Defendants, which included forcibly entering the home, drawing tasers, and grabbing and pulling Plaintiffs, was unreasonable in light of the circumstances.

      As noted by courts in this district, there is no bright line between acceptable and excessive use of force. Clifton v. Borough of Eddystone, 824 F. Supp. 2d 617, 630 (E.D. Pa. 2011).  Whether the amount of force applied by an officer was reasonable is normally an issue for the jury. Rivas v. City of Passaic, 365 F.3d 181, 198 (3d Cir. 2004).  Making an arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Id. However, given the circumstances leading up to the arrests, this Court finds that there exists a genuine dispute as to whether the force used during the non-custodial seizure was unreasonable, or even necessary at all, in order to issue a noise violation citation.  Therefore, summary judgment is inappropriate as to Plaintiffs' excessive force claim.

### iii. Qualified Immunity

      Defendants contend that, even if the Court finds the issue of whether there was a constitutional violation "too close to call," Officers Vega and Gingrasso are nevertheless entitled to qualified immunity. (ECF No. 34 at 12.) Defendants assert that there was "absolutely no reason" for Officers Vega or Gingrasso to have been on notice, or to believe that every reasonable official in their position would have understood that their actions were violative of Plaintiffs' rights. Id. at 14. In response, Plaintiffs argue that Officer Vega's "failure and/or refusal to issue a noise citation after Plaintiffs properly identified themselves was plainly incompetent." (ECF No. 38 at 17.) With respect to Officer Gingrasso, Plaintiffs maintain that there exists a genuine dispute as to whether Rodriguez Perez actually hit Officer Gingrasso. Id. Thus, viewing all facts in favor of Plaintiffs, it would be clear to a reasonable officer that pulling Ms. Rodriguez out of her family's home without cause was a known violation of law. Id.

The issue of qualified immunity should be decided at the earliest possible stage in litigation because, as it is "an immunity from suit rather than a mere defense to liability," it is "effectively lost if a case is erroneously permitted to go to trial." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)); see also Hunter v. Bryant, 502 U.S. 224, 227 (1991). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 202 (2001). Thus, this determination "must be made in light of the specific factual context of the case." Id. at 201.

Qualified immunity attaches unless a Plaintiff demonstrates that the official's conduct violated a clearly established right. Anderson v. Creighton, 483 U.S. 635, 640. Accordingly, the court must consider two factors: (1) whether the official violated a statutory or constitutional right, and (2) whether that right at issue was "clearly established" at the time of the defendant's alleged misconduct. Kopec v. Tate, 361 F.3d 772, 776 (3d Cir.2004) (citing Saucier 533 U.S. at 200–01). District courts are, however, permitted "to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis" to address first "in light of the circumstances of the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236 (2009). As discussed above, there exists a genuine issue of material fact as to whether the force used by Defendants during the non-custodial seizure was excessive and unreasonable in violation of Plaintiffs' Fourth Amendment rights. Thus, the Court turns to the second prong of qualified immunity, whether it would have been clear to a reasonable officer that Defendants' conduct was unlawful in light of "clearly established" law. Saucier, 533 U.S. at 201–02.

A right is "clearly established" when, "at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (quoting Anderson 483 U.S. at 640). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful… but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Hope v. Pelzer, 536 U.S. 730, 739 (2002). Officials can still be on notice that their conduct violates established law even in novel factual circumstances. Id. at 741. The Supreme Court instructs that the "salient question" is whether the state of the law at the time gives officials fair warning that their conduct is unconstitutional. Id.

If an official could have reasonably believed that his actions were lawful, regardless of whether they were, then the official receives immunity. <u>Anderson</u>, 483 U.S. at 638. This Court finds that issues of fact preclude qualified immunity because, after resolving all factual disputes in favor of the Plaintiffs, reasonable officers would not believe that, after receiving enough information to issue a noise citation, they would need to enter a home, draw tasers, and take occupants into custody in order to execute the citation. A person has a clearly established right to be free from excessive force when he or she is compliant with officers, not resisting arrest, not attempting to flee, and does not present a threat to the safety of officers. <u>See, e.g.</u>, <u>Seals v. City of Lancaster</u>, 553 F. Supp. 2d 427, 432 (E.D. Pa. 2008) (finding that it would be clear to a reasonable officer that his actions were unlawful in pushing a compliant person to the ground who was compliant, not resisting arrest, attempting to flee, or presenting a threat to his safety).

In Pennsylvania, criminal proceedings in summary cases are instituted either by: (1) issuing a citation to the defendant, (2) filing a citation, (3) filing a complaint, or (4) arresting without a warrant when arrest is specifically authorized by law. Pa. R. Crim. P. 400.[7] Generally, an arrest is authorized for a summary offense, such as a violation of the noise ordinance, only "in exceptional circumstances such as those involving violence, or the imminent threat of violence, or those involving a danger that the defendant will flee." Pa. R. Crim. P. 440 cmt. Defendants allege that, because Parilla Perez had provided fake information, they could not verify his identify and had to take Plaintiffs in for a LiveScan to issue a noise citation. From Defendants' perspective, the force used was reasonable because, without taking Plaintiffs in for the LiveScan, they could not issue a noise citation.

Plaintiffs respond that Parilla Perez offered three valid forms of identification in addition to his date of birth, name, and Social Security number. In complying with Officer Vega's repeated requests for further identification, both Rodriguez Perez and Rivera Cruz claim that they offered to provide their own and returned inside the house to retrieve it, but were not given sufficient time to do so before Defendants forcibly entered their home.

---

[7] This Court looks to Pennsylvania procedures for instituting criminal proceedings in a summary offense not to challenge the validity of Plaintiffs' underlying seizure or conviction, but simply as a guide as to the process police officers generally follow when commencing such proceedings.

Given unresolved factual disputes, several key issues of fact affect the reasonableness of Defendants' conduct including whether: Parilla Perez provided three valid forms of identification and a valid Social Security number, Defendants needed to take Plaintiffs into custody to validate their identities to issue a noise citation, Plaintiffs retreated into the residence to avoid receiving a citation or if they were attempting to comply with Officer Vega's commands to retrieve identification, Officer Vega was in fact pulled into the home or whether he forcibly entered with other officers, and Officer Gingrasso needed to draw his taser in order to assist Officer Vega in taking Rivera Cruz into custody.

Where the reasonableness of the force used is factually disputed, and the force can be interpreted as plainly unreasonable and in violation of a clearly established right if a plaintiff's factual account is given credit, district courts tend to deny qualified immunity. See, e.g., Geist v. Ammary, 40 F.Supp.3d 467, 485–86 (E.D. Pa. 2014) (denying qualified immunity on excessive force claim because of unresolved factual disputes as to the reasonableness of the officer's use of a taser); Jackson v. City of Pittsburgh, 688 F.Supp.2d 379, 401 (W.D. Pa. 2010) (denying qualified immunity on excessive force claim in a factually disputed case where, under plaintiff's version of the facts, officers used force against the unarmed plaintiff who did not exert any threats toward the officers); Reynolds v. Smythe, 418 F.Supp.2d 724, 735 (E.D.Pa.2006) (denying summary judgment on qualified immunity because factual disputes remained about how the actual incident occurred); Garey v. Borough of Quakertown, No. 12–0799, 2013 WL 3305222, at *6 (E.D.Pa. Jul. 1, 2013) (denying summary judgment on qualified immunity defense because factual disputes about reasonableness of officer's conduct remained); Shultz v. Carlisle Police Dep't, 706 F.Supp.2d 613, 624 (M.D.Pa.2010) (denying summary judgment on qualified immunity because factual disputes remained about whether a reasonable officer would have acted the same way). For these reasons, Defendants' motion for summary judgment based on qualified immunity is **DENIED** as to Plaintiffs' excessive force claim.

### B. Selective Enforcement

Defendants also move for summary judgment on Plaintiffs' selective enforcement claim (Count II). Defendants maintain that there is no evidence in the record that Officers Gingrasso or Vega took any discriminatory action towards Plaintiffs that singled them out from other similarly situated persons. (ECF No. 34 at 15.)

In support of their claim for selective enforcement, Plaintiffs assert that

Defendants selectively treated Plaintiffs differently and more harshly in response to a noise complaint because of their Hispanic heritage. (ECF No. 19 ¶ 58.) Plaintiffs maintain that non-Hispanic residents lawfully within their homes are not: questioned as to the validity of valid forms of identification, falsely accused of having fake identification, and falsely accused of striking a police officer, having a taser pointed at them, and dragged from their home. Id. ¶ 56. In response to the motion for summary judgment, Plaintiffs also argue that Officer Vega's interactions with Rodriguez Perez and Rivera Cruz, in comparison with his encounter with Parilla Perez, "established he treated them differently based on nothing more than their gender." These disparities in treatment include not giving Plaintiffs Rivera Cruz and Rodriguez Perez an opportunity to show identification and immediately grabbing and handcuffing them.

Discriminatory enforcement of a facially valid law is unconstitutional under the equal protection clause. Hill v. City of Scranton, 411 F.3d 118, 125 (3d Cir. 2005). To establish a selective-enforcement equal-protection claim against defendants, a plaintiff must demonstrate (1) that he was treated differently from other similarly situated individuals, and (2) "that this selective treatment was based on an unjustifiable standard, such as race, or religion, or some other arbitrary factor ... or to prevent the exercise of a fundamental right." Dique v. New Jersey State Police, 603 F.3d 181, 184 at n. 5 (3d Cir.2010) (citing Hill, 411 F.3d at 125) (internal quotation marks omitted).

Plaintiffs' claims arise from the officer's enforcement of the noise ordinance against them, however, they do not provide any evidence that the noise ordinance has been enforced differently against other residents as compared to them. Plaintiffs simply allege that "it is inconceivable that other citizens in the City of Reading who open the door to their own home, represent that they are the head of the household, demonstrate control of the household, and provide a minimum of two forms of valid identification, are subject to the treatment that Mr. Perez was subjected to by Officer Vega." As Defendants note, Officer Vega testified that as soon as he heard the music playing from two blocks away, and before he had a chance to discern the ethnicity or gender of the Plaintiffs, he decided that he was going to cite the resident for violation of the City's noise ordinance. (Vega Dep. 162:4-13.)

Intentional or purposeful discrimination is a necessary element of an equal protection claim. Wilson v. Schillinger, 761 F.2d 921, 929 (3d Cir.1985). "For a § 1983 plaintiff to survive a motion for summary judgment where intent is an element of his claim, the plaintiff

must provide affirmative evidence from which a jury could find that the plaintiff has carried his or her burden of proving the pertinent motive." White v. Brommer, No. 09-CV-04353, 2011 WL 3625020, at *13 (E.D. Pa. Aug. 17, 2011), aff'd, 488 F. App'x 564 (3d Cir. 2012) (internal citations omitted). Plaintiffs have not provided any evidence of Defendants' intent to discriminate in their enforcement of the noise ordinance due to Plaintiffs' race or gender. As no genuine issue of material fact remains as to whether Defendants' selectively enforced the noise ordinance, Defendants' motion for summary judgment on Plaintiffs' selective enforcement claim is **GRANTED**.

### C. Conspiracy

In Count III, Plaintiffs allege that Defendants conspired to treat Plaintiffs differently because of their Hispanic heritage in violation of their equal protection under the law and right to be free from excessive force. Plaintiffs further assert that Defendants conspired to allege false conduct, specifically that Parilla Perez had presented false identification and that Rodriguez Perez had assaulted Defendant Gingrasso. Plaintiffs provide the following support for their allegations: (1) after rejecting three forms of identification, Defendant Vega threatened to call his "friends", (2) Defendant police officers knew Defendant Vega has rejected valid forms of identification, (3) Defendant John Doe can be seen on video shaking his head "no" as to the question of whether the officers had a warrant, (4) Defendant Gingrasso states that Rodriguez Perez hit him, and this false statement is immediately backed up by Defendant John Doe, (5) none of the officers stepped in to prevent Defendant Gingrasso from unlawfully dragging Rodriguez Perez out of the home, (6) it is reasonably presumed and implied that Defendants agreed to arrest Parilla Perez despite having no justification for doing so, and (7), after Defendant John Doe "violently" pushed Plaintiffs' mother and threatens that "she's next," the failure of any police officer to respond implied they agreed with this wrongful conduct. (ECF No. 19 ¶ 66(a)-(g)).

Defendants move for summary judgment on the conspiracy claim, first arguing that the claim fails because there was no underlying constitutional violation. Second, Defendants argue that Plaintiffs provided no evidence whatsoever of a conspiracy.

Section 1985(3) provides a cause of action when "two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and

immunities under the laws . . . ." 42 U.S.C. § 1985(3). To state a claim under section 1985(3), "a plaintiff must allege: (1) a conspiracy; (2) motivated by a racial or class based discriminatory animus designed to deprive, directly or indirectly, any person or class of persons to the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to person or property or the deprivation of any right or privilege of a citizen of the United States." Lake v. Arnold, 112 F.3d 682, 685 (3d Cir. 1997) (citing United Bhd. of Carpenters & Joiners, Local 610 v. Scott, 463 U.S. 825, 828-29 (1983); Griffin v. Breckenridge, 403 U.S. 88, 102-03 (1971)).

Because this Court has granted summary judgment on Plaintiffs' selective enforcement claim, any conspiracy to violate Plaintiffs' civil rights must stem from their Fourth Amendment excessive force claim. This Court finds, however, that Plaintiffs have failed to provide sufficient evidence that Defendants conspired to violate Plaintiffs' Fourth Amendment rights.  To prevail on the first element of a conspiracy claim, Plaintiffs must demonstrate through specific facts that Defendants "reached an understanding" to deprive them of their rights. See Chicarelli v. Plymouth Garden Apartments, 551 F.Supp. 532, 539 (E.D.Pa.1982). It is insufficient for Plaintiffs merely to make broad, conclusory allegations of such a conspiracy, or to show merely that Defendants had a common goal or acted in concert. Id. Rather, Plaintiffs must make "specific factual allegations of combination, agreement, or understanding among all or between any of the defendants to plot, plan, or conspire to carry out the alleged chain of events." Hammond v. Creative Financial Planning, 800 F.Supp. 1244, 1249 (E.D.Pa.1992).

Plaintiffs do not provide specific facts that Defendants formally agreed to violate their constitutional rights by the use of excessive force. Instead, Plaintiffs provide evidence of individual actions taken by Defendant police officers which they assert "reasonably imply" or "presume" an agreement between officers. These broad, conclusory allegations do not support a finding that any of the officers devised a plan or conspired to violate Plaintiffs' Fourth Amendment rights during the incident. Therefore, Defendants' motion for summary judgment on Plaintiffs' conspiracy claim is **GRANTED**.

### D.  Monell

In Counts I, II, and III, Plaintiffs assert claims against the City of Reading as a defendant.  Plaintiffs maintain that the City of Reading (1) permitted a custom, practice, and procedure to exist in which its police officers acted to disregard Plaintiffs' personal and constitutional liberty interests and (2) failed to adequately train, supervise, discipline, or in any

other way control its officers in the exercise of police functions.[8] Defendants move to dismiss these claims against the City of Reading, arguing that, because no constitutional violation occurred, the city cannot be held liable. Further, Defendants claim that even if a constitutional violation occurred, the deprivation of rights did not occur because of a deficient custom, practice, or policy.

A municipality like the City of Reading cannot be held liable under § 1983 on the doctrine of respondeat superior. Monell v. Dep't of Soc. Serv. of City of New York, 436 U.S. 658, 691 (1978). However, as set forth in Monell, a municipality may be liable when its official policy or custom causes an injury to a plaintiff. Id. at 694-95. Under Monell, a plaintiff must establish that: (1) the municipality had a policy or custom that deprived the plaintiff of his or her constitutional rights; (2) the municipality acted deliberately and was the moving force behind the deprivation; and (3) the plaintiff's injuries were caused by the identified policy or custom. Id. at 692-94.

Inadequate police training—or the absence of training altogether—may be the basis for a § 1983 suit if the deficient training amounts to "deliberate indifference" to the rights of the person aggrieved. See City of Canton v. Harris, 489 U.S. 378, 388 (1989). The municipal policy must be the "moving force [behind] the constitutional violation." Id. at 389 (alteration in original) (quoting Polk Cnty. v. Dodson, 454 U.S. 312, 326 (1981)). To attach liability, the failure to train must be a "deliberate" and "conscious" choice by the municipality. See id.

This Court has found that there exists a genuine issue of material fact as to whether Defendants violated Plaintiffs' Fourth Amendment rights to be free from excessive force. Therefore, the question is whether the City of Reading, acting deliberately, maintained a policy or custom that was a moving force in causing a violation of Plaintiffs' Fourth Amendment rights. In its Response to Defendants' Motion for Summary Judgment, Plaintiffs specifically assert that Officer Vega has: no formal or informal training concerning whether another person is being truthful, poor training regarding how to handcuff a suspect, and poor training concerning the procedures for issuing a noise violation. (ECF No. 38 at 21.)[9] This Court finds, however,

---

[8] With respect to their selective enforcement claim, Plaintiffs also contend that the City of Reading "maintained policies, practices, procedures and/or customs of treating Hispanic residents differently from non-Hispanic residents." Because this Court grants summary judgment on the selective enforcement claim (Count II) we find no underlying constitutional violation that would permit a Monell claim on this basis.

[9] Plaintiffs claim that Officer Vega's training to "grab a suspect before handcuffing" him or her was poor because it resulted in an assault on Rivera Cruz. Plaintiffs also assert that Officer Vega's inability to

19

that Plaintiffs have failed to establish that the City of Reading's "failure to train" in each of the identified areas was "deliberate" and a "moving force" behind the constitutional violation.

"'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Connick v. Thompson, 563 U.S. 51, 61 (2011) (internal citations omitted). To demonstrate deliberate indifference where a plaintiff claims failure to train or supervise, the plaintiff must ordinarily show a "pattern of similar constitutional violations by untrained employees." Thomas v. Cumberland County, 749 F.3d 217, 223 (3d Cir.2014) (quoting Connick, 563 U.S. at 62). Plaintiffs have provided no evidence of a pattern similar incidents regarding allegedly poor training with respect to determining the truthfulness of a person, handcuffing a suspect, or issuing a noise citation.

Sometimes the need for training of municipal employees can be said to be so obvious that failure to do so could properly be characterized as deliberate indifference to constitutional rights, for purpose of a § 1983 municipal liability claim, even without a pattern of constitutional violations. 42 U.S.C.A. § 1983. Thomas 749 F.3d, at 233. "To find deliberate indifference from a single-incident violation," the risk of injury must be a "highly predictable consequence" of the municipality's failure to train and supervise its officers. Id. at 225 (quoting Connick, 563 U.S. at 63–64). However, Plaintiffs have not offered any evidence that the potential risk of excessive force was a "highly predictable consequence" of the City of Reading's supposed failure to train its officers to ascertain a person's truthfulness, handcuff a person without first grabbing them, or issue a noise citation.

Even if Plaintiffs had plead facts indicating that such deliberate indifference existed, they have failed to establish how such indifference was the "moving force" behind the alleged violation. There must be "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." Brown v. Muhlenberg Township, 269 F.3d 205, 214 (3d Cir. 2001) (quoting City of Canton, 489 U.S. at 385). In showing that a defective policy or custom was the moving force behind a violation of plaintiff's constitutional rights, a plaintiff may establish that alternatives for preventing this type of harm were known and available to policymakers but that the policymakers either deliberately chose not to pursue them or

---

confirm the validity of Parilla Perez's identification is either "the result of poor training or negligence by the police department itself.

acquiesced in a longstanding policy or custom of inaction in this regard. Eichelman v. Lancaster Cty., 510 F. Supp. 2d 377 (E.D. Pa. 2007)(citing Simmons v. City of Philadelphia, 947 F.2d 1042, 1064, 1074 (3rd Cir.1991). Plaintiffs have provided no alternative training policies or customs available to the City of Reading in each identified category that would have prevented this type of specific harm. Overall, Plaintiffs have not established that, because of any specific policy or lack of policy attributed to the City of Reading, the Defendant officers violated Plaintiffs' Fourth Amendment right to be free from excessive force. Accordingly, Defendants' motion for summary judgment is **GRANTED** with respect to Plaintiffs' claims against the City of Reading.

### E.  State Law Claims

In Counts IV and V of the Amended Complaint, Plaintiffs bring claims under Pennsylvania state law for assault, battery, and trespass to land. Defendants move for summary judgment on these state law claims, arguing that: (1) Plaintiffs have produced no evidence that either Officer Vega's or Gingrasso's actions in effectuating the lawful arrest of Plaintiffs were willful misconduct or outside the duties of his job (2) the state law claims are barred by the Pennsylvania Subdivision Political Tort Claim Act ("PSTCA"), and (3) Defendants are entitled to official immunity on the state law claims.

#### i.  Assault and Battery

Under Pennsylvania law, "an assault is an intentional attempt by force to do an injury to the person of another, and a battery is committed whenever the violence menaced in an assault is actually done, though in ever so small a degree, upon the person." Renk v. City of Pittsburgh, 641 A.2d 289, 293 (Pa. 1994) (citing Cohen v. Lit Bros., 70 A.2d 419, 421 (Pa. Super. Ct. 1950)). "In making a lawful arrest, a police officer may use such force as is necessary under the circumstances to effectuate the arrest." Russoli v. Salisbury Twp., 126 F.Supp.2d 821, 870 (E.D.Pa.2000) (quoting Renk, 641 A.2d at 293). "The reasonableness of the force determines whether the police officer's conduct constitutes an assault and battery." Id. (citing Renk, 641 A.2d at 293)." Accordingly, "[a] claim brought under Pennsylvania law for excessive force by a police officer is a claim for assault and battery." Id.

As noted in Part II.A, supra, there are disputed facts which preclude the Court from determining whether the officers' use of force was reasonable during the non-custodial seizure. Therefore, Plaintiff has also adequately stated a claim for assault and battery. See Martin

v. City of Reading, 118 F. Supp. 3d 751, 767 (E.D. Pa. 2015) (finding that, where genuine issues of material fact existed with respect to Plaintiffs' 1983 excessive force claims, Plaintiffs' had alleged sufficient facts for state law assault and battery claims); Garey v. Borough of Quakertown, No. CIV.A. 12-799, 2012 WL 3562450, at *5 (E.D. Pa. Aug. 20, 2012) (same); Russoli, 126 F. Supp. 2d at 870 (same).

### ii. Trespass

Pennsylvania follows the Second Restatement of Torts with respect to claims for trespass and continuing trespass. MD Mall Assocs., LLC v. CSX Transportation, Inc., 288 F. Supp. 3d 565, 586 (E.D. Pa. 2017), aff'd, 777 F. App'x 43 (3d Cir. 2019). Under the Restatement, a person may be liable for trespass "if he intentionally...enters land in the possession of [another], or causes a thing or a third person to do so." Id. (quoting Restatement (Second) of Torts § 158(a) (Am. Law Inst. 1965)).

Conduct which would otherwise constitute a trespass is not a trespass if it is privileged. Id., cmt. e. Such a privilege may be given by law because of the purpose for which the actor acts or refrains from acting. Id. Generally, police officers may not enter a home without warrant to carry out a seizure absent exigent circumstances. Payton v. New York, 445 U.S. 573, 586–89 (1980). However, as discussed above, Plaintiffs may not challenge the validity or lawfulness of the underlying arrest as their decision to accept and complete the ARD program precludes them from doing so. See Gilles, 427 F.3d at 211-12. Because Defendants' conduct in arresting Plaintiffs' without warrant is presumed to be valid, this Court finds that Defendant officers were afforded privilege to enter the home to effectuate such arrests. Therefore, Defendants' motion for summary judgment is **GRANTED** with respect to Plaintiffs' state law claim for trespass.

### iii. Immunity

Defendants contend that, even assuming Plaintiffs' state tort claims for assault and battery were viable, they would be barred pursuant to the PSTCA. Under the Political Subdivision Tort Claims Act, 42 Pa. Cons. Stat. §§ 8541–8564, except as provided, local agencies are generally immune from claims for damages based upon any injury to a person or property. 42 Pa. Cons. Stat. § 8541. There are eight "acts" excepted from the immunity granted under § 8541, however none applies here.[10] Municipal employees, such as police officers, are

---

[10] The eight exceptions are: (1) vehicle liability; (2) care, custody, or control of personal property;

22

generally immune from liability to the same extent as long as the act committed was within the scope of the employee's office or duties.  <u>Sanford v. Stiles</u>, 456 F.3d 298, 315 (3d Cir. 2006)(citing 42 Pa. Cons. Stat. § 8545). Employees, however, are not immune from liability under § 8545 where their conduct amounts to "actual malice" or "willful misconduct". <u>Id.</u> quoting (42 Pa. Cons. Stat. § 8550).

To find that a municipal employee's conduct amounts to "willful misconduct", there must be a determination not only that the officer committed the acts in question, but that he willfully went beyond the bounds of the law. <u>Russoli</u>, 126 F. Supp. 2d at 868. Therefore an officer may be liable for assault and battery if it is shown not just that he acted intentionally, but also that the officer knew that force used was not reasonable under the circumstances. <u>Id.</u> As discussed above in the Court's qualified immunity analysis, Plaintiffs have alleged sufficient facts from which a jury could determine that the officers knew that the force they used was unreasonable under the circumstance. Viewing the facts in the light most favorable to the Plaintiffs, they were compliant with each officer's commands, provided enough information to issue a noise citation without having to be taken into custody, did and did not present a threat to the safety of officers. Thus, a jury could find that the force used during the non-custodial seizure was unreasonable, and potentially unnecessary, in order to issue a noise violation citation given these circumstances. For those reasons, summary judgment is **DENIED** as to Plaintiffs' state law claims for assault and battery.

### F. Punitive Damages

Defendants also argue that, even if the Court does not grant summary judgment on Plaintiffs' claims in total, it should grant summary judgment as to Plaintiffs' claim for punitive damages.  Defendants contend that "there is no evidence that Officer Vega or Gingrasso were motivated by an evil motive or that they were recklessly indifferent to Plaintiffs' constitutional rights."  In response, Plaintiffs claim that, due solely to Officer Vega's "incompetence and subsequent frustration over how to properly issue a noise citation, Officer Vega recklessly and falsely accused Mr. Perez of providing fake identification."  Plaintiffs also claim that a reasonably jury would "likely agree Officer Gingrasso's videotaped statement that "she hit me" was an intentional lie done for the sole purpose to justify his assault upon her."

---

(3) real property; (4) trees, traffic controls, and street lighting; (5) utility service facilities; (6) streets; (7) sidewalks; and (8) care, custody, or control of animals. <u>Id</u>. § 8542.

Punitive damages are available in an action under § 1983 when the defendant's conduct is "shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." Smith v. Wade, 461 U.S. 30, 56 (1983). "The purpose of punitive damages is to punish the defendant for his willful or malicious conduct and to deter others from similar behavior." Memphis Community School Dist. v. Stachura, 477 U.S. 299, 306 n. 9 (1986). Pennsylvania has a similar standard for awarding punitive damages "for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." Hutchison ex rel. Hutchison v. Luddy, 870 A.2d 766, 770 (Pa. 2005).

Construing the facts and reasonable inferences therefrom in light most favorable to Plaintiff, the Court finds that there are sufficient facts on the record that would allow a reasonable juror to determine that Defendants acted in a callous and reckless manner. Plaintiffs contend that they were compliant with the officers' commands, provided multiple forms of valid identification, and did not resist arrest. If the jury finds these facts to be true at trial, it could reasonably infer that Officer Vega's state of mind was reckless or callously indifferent to Plaintiffs' right to be free from excessive force when he forcibly entered the residence, drew his taser, and pulled Rivera Cruz in an attempt to take her into custody. Similarly, a jury could reasonably infer that Officer Gingrasso's state of mind was reckless when he forcibly entered the home, drew his taser, and began pulling Rodriguez Perez out of the home. Therefore, summary judgment is **DENIED** as to Plaintiffs' claim for punitive damages.

## V.   CONCLUSION

Based on the foregoing reasons, this Court finds that Plaintiffs have come forth with evidence sufficient to raise a genuine dispute of material fact as to whether Defendants used excessive force or caused an assault and battery on Plaintiffs when they forcibly entered the residence, drew tasers, and grabbed and pulled Plaintiffs in order to issue a noise citation. Additionally, neither Officer Vega nor Officer Gingrasso is entitled to qualified or official immunity on the excessive force, assault, and battery claims, and thus are not immune from suit. This Court finds that there does not exist disputed genuine issues of material fact with respect to Plaintiffs selective enforcement, conspiracy, and trespass claims. Further, because Plaintiffs have failed to produce evidence sufficient to give rise to a genuine dispute over the causal nexus between any deficiencies in the City of Reading's training program and the constitutional harm

of which Plaintiffs complain, the City is entitled to summary judgment on Plaintiffs' <u>Monell</u> claims.  Accordingly, Defendants' Motion for Summary Judgment is **DENIED** in part and **GRANTED** in part.